**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MIDWEST OPERATING ENGINEERS, WELFARE FUND and MIDWEST OPERATING ENGINEERS PENSION TRUST FUND, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 15 C 4446 |
| CORDOVA DREDGE, a division of RIVERSTONE GROUP, INC., | ) ) ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Before the Court are Defendant Cordova Dredge's ( "Cordova's") motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and Plaintiffs Midwest Operating Engineers Welfare Fund ("Welfare Fund") and Midwest Operating Engineers Pension Fund's ("Pension Fund") (collectively, "the Funds'") motion for summary judgment and in opposition to Cordova's motion to dismiss. (*See* R.9; R.14.) Cordova asserts that dismissal of the Funds' claims is warranted because the Funds cannot present any basis for their position that Cordova retains an obligation to contribute to the Funds after the National Labor Relations Board's ("NLRB's") decertification of the International Union of Operating Engineers, Local 150, AFL-CIO ("Local 150" or the "Union") as the bargaining representative of Cordova's bargaining unit employees. (R.9; R.10.) The Funds responded and moved for summary judgment pursuant

to Federal Rule of Civil Procedure 56 asserting that genuine issues of fact do not exist and that they are entitled to judgment as a matter of law.  (R.14; R.17.)

## LEGAL STANDARD

### I.      Rule 12(b)(6) and Summary Judgment

#### A.      Rule 12(b)(6)

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014).  Under Rule 12(b)(6), a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007).  Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570).  A district court's analysis under Rule 12(b)(6) "rests on the complaint, and [the court] construe[s] it in the light most favorable to the plaintiffs, accepting as true all well-pleaded facts alleged and drawing all permissible inferences in their favor." *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 700 (7th Cir. 2014); *see also Teamsters Local Union No. 705 v. Burlington N. Santa Fe, LLC*, 741 F.3d 819, 823 (7th Cir. 2014); *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665–66 (7th Cir. 2013).

When ruling on a Rule 12(b)(6) motion, a court generally may consider only the plaintiff's complaint. *Rosenblum v. Travelbyus.com Ltd.,* 299 F.3d 657, 661 (7th Cir. 2002).  Rule 10(c) provides, however, that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."  Fed. R. Civ. P. 10(c).  When a party attaches documents to a motion to dismiss, the court must either convert the 12(b)(6) motion into a

motion for summary judgment under Rule 56, or exclude the documents attached to the motion

to dismiss and continue under Rule 12. *Levenstein v. Salafsky,* 164 F.3d 345, 347 (7th Cir.1998);

*see also* Fed. R. Civ. P. 12(d). A court may consider documents attached to a motion to dismiss,

however, if they are referred to in the plaintiff's complaint and if they are central to the

plaintiff's claim. *Levenstein,* 164 F.3d at 347 (quoting *Wright v. Associated Ins. Cos., Inc.,* 29

F.3d 1244, 1248 (7th Cir.1994)). This narrow exception is "aimed at cases interpreting, for

example, a contract" and "is not intended to grant litigants license to ignore the distinction

between motions to dismiss and motions for summary judgment." *Id.* The district court

ultimately has discretion in determining whether to convert a motion to dismiss into a motion for

summary judgment. *Id; Hecker v. Deere & Co.,* 556 F.3d 575, 583 (7th Cir. 2009).

Here, Cordova originally attached five exhibits to its motion to dismiss which appear to

either be attached to or referred to and central to the claims in the Funds' complaint or they are

matters of public record of which the Court can take judicial notice. (*See e.g.,* R.10-2, Ex. A

(R.1-1, attached as Ex. A to the Compl., Quarry Agreement); R.10-4 and 10-5 (R.1, ¶¶ 7, 8

(referencing the Declarations of Trust for the Funds)); *see also e.g., Henson v. CSC Credit

Servs.*, 29 F.3d 280, 284 (7th Cir. 1994). The Funds responded with a motion for summary

judgment and attached numerous exhibits not submitted with or referenced in the Complaint and

that the parties do no assert are in the public record. (*See e.g.,* R.16-1, Ex. A, Bernstein Decl.;

Ex. B, Douglas Decl.; R.16-2 through R.16-4, Ex. C, Health and Welfare Plan of the [Welfare

Fund]; R.16-5, Midwest Operating Engineers Pension Plan.) Cordova thereafter filed its "Reply

Supporting its Motion to Dismiss and Opposing Plaintiffs' Summary Judgment Motion", which

included filing a Rule 56(b)(3)(C) statement and supporting exhibits—including exhibits not

attached to or referenced in the Complaint and not available in the public record. (*See e.g.,* R.21-1, Guth Decl.; R.21-2, Letter sent from A.Eggers to T.Bernstein dated March 24, 2015.)

Because the parties rely on facts outside the Complaint relating to their arguments for res judicata and collateral estoppel as well as the substantive arguments as to whether Cordova is obligated to continue paying into the Funds post-decertification of the Union, the Court treats Cordova's motion to dismiss as one for summary judgment. Defendant has been given a full and fair opportunity to respond to Plaintiffs' cross-motion for summary judgment and in doing so, has provided a detailed factual statement pursuant to Rule 56(b)(3)(C) which also refers to documents not referenced in the Complaint. The Court has, therefore, provided notice to the parties of its consideration of Cordova's motion to dismiss as one for summary judgment and the parties have been provided the mandatory "reasonable opportunity to submit affidavits and extraneous proofs" in response. Conversion is therefore proper. *See e.g., Covington v. Illinois Security Service, Inc.,* 269 F.3d 863, 865 (7th Cir. 2001) ("Although we have at times allowed the conversion of a motion to dismiss into one for summary judgment to be implicit, reversal of such a ruling may become necessary if the district court has not provided the adversely affected party with notice and an opportunity to respond"); *Edward Gray Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 94 F.3d 363, 366 (7th Cir. 1996) (explaining the requirement of reasonable opportunity to respond is mandatory, not discretionary).

### B. Summary Judgment

Summary judgment is appropriate where the admissible evidence shows that no genuine dispute exists as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "A 'material fact' is one identified by the substantive law as affecting the outcome of the suit." *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  "A 'genuine issue' exists with respect to any such material fact, and summary judgment is therefore inappropriate, when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  Conversely, "where the factual record taken as a whole could *not* lead a rational trier of fact to find the nonmoving party, there is nothing for a jury to do."  *Bunn*, 753 F.3d at 682 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)).

In determining whether a genuine issue of material fact exists, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party.  *See Bunn*, 753 F.3d at 682 (citing *Anderson*, 477 U.S. at 255); *see also Kvapil v. Chippewa County, Wis.*, 752 F.3d 708, 712 (7th Cir. 2014).  However, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson*, 477 U.S. at 248 (emphasis in original).  In reviewing evidence opposing a motion for summary judgment, courts are not obliged to entertain a "metaphysical doubt."  *Matsushita*, 475 U.S. at 586.  The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question."  *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013).

## II.     Northern District of Illinois Local Rule 56.1

Northern District of Illinois Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary."  *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (quoting

*Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994)). Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir. 2009) (quoting L.R. 56.1(a)(3)). The nonmoving party must file "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Id.* (quoting L.R. 56.1(b)(3)(B)). The nonmoving party also may submit a separate statement of additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon to support those facts. *See* L.R. 56.1 (b)(3)(C); *see also Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008).

The purpose of Rule 56.1 statements is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (finding Rule 56.1 statements incompliant when they fail to adequately cite the record and are filled with irrelevant information, legal arguments, and conjecture.") The Court may disregard statements and responses that do not properly cite to the record. *See Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809-810) (7th Cir. 2005.) Moreover, the requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000); *see also Thele v. Sunrise Chevrolet, Inc.*, No. 03 C 2626, 2004 WL 1194751, at *3 (N.D. Ill. May 28, 2004) ("The mere denial of a particular fact without specific references to affidavits, parts of the record, and other supporting materials is insufficient, and, where a properly supported factual assertion is met with such a

naked denial, the fact may be deemed admitted.") "[D]istrict courts are entitled to expect strict compliance with Local Rule 56.1." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 604 (7th Cir. 2006).

## III.    Relevant Facts

### A.    The Funds

The Welfare Fund and the Pension Fund are each an "employee welfare benefit plan" and "welfare plan" pursuant to the Employment Retiree Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461. (Stmt. of Undisputed Facts, ¶¶ 1-3.)[1] The Welfare Fund provides health benefits to nearly 60,000 people, while the Pension Fund has over 27,000 participants. (Stmt. of Undisputed Facts, ¶ 3.) The Funds—subject to ERISA—are administered according to their respective trust agreements, and provide benefits to members and their dependents based on the language negotiated by Local 150 and signatory employers set forth in the various collective bargaining agreements. (Stmt. of Undisputed Facts, ¶ 3.) Cordova is a division of RiverStone Group, Inc. that operates a dredging operation located in Cordova, Illinois. (Stmt. of Undisputed Facts, ¶ 4; Stmt. of Addt'l Undisputed Facts, ¶ 1; R.21-1, Guth Decl., ¶ 4.)[2]

---

[1] Citations to "Stmt. of Undisputed Facts" refer collectively to the Funds' Local Rule 56.1(a)(3) Statement of Facts (R.16) and Cordova's Responses (R.21). For purposes of clarity, the Court will use this citation reference where the fact preceding the citation is undisputed or admitted. "In determining what is disputed, we focus not only on whether the parties profess to dispute a fact, but also on the evidence the parties offer to support their statements. When we cite as undisputed a statement of fact that a party has attempted to dispute[] that reflects our determination that the evidence does not show that the fact is in genuine dispute." *Zitzka v. Vill. of Westmont*, 743 F.Supp.2d 887, 897 (N.D. Ill. 2010).

[2] The Court has jurisdiction over the Funds' claims pursuant to ERISA. *See* 29 U.S.C. §§ 1132(a)(3), 1132(e), 1145; 28 U.S.C. § 1331. The parties do not dispute that the Northern District of Illinois is the proper venue for this action because the Funds are administered in Cook County, Illinois. *See* 29 U.S.C. § 1132(e)(2).

## B. The Collective Bargaining Agreements

Formerly known as Moline Consumers, Inc., RiverStone negotiated collective bargaining agreements with the Local 150, covering construction material production employees at various facilities in northwest Illinois including Cleveland Quarry in Colona, Illinois,[3] Allied Stone in Milan, and Cordova Dredge on the Mississippi River near Cordova, Illinois. (Stmt. of Undisputed Facts, ¶ 7; Stmt. of Addt'l Undisputed Facts, ¶ 11.) The employer and the Union customarily negotiated the collective bargaining agreements ("CBAs") jointly, but after ratification by the employees, the employer and Union signed a separate contract for each facility. (Stmt. of Undisputed Facts, ¶ 7.) Cordova entered a CBA with Local 150 effective from May 3, 2010 through May 3, 2015 ("Quarry Agreement"). (Stmt. of Undisputed Facts, ¶ 8; R.21-1, Guth Decl., ¶ 5; R.1-1, Quarry Agreement, attached as Ex. A to R.1, Complt.) Mr. Marshall Guth, Vice President Operations at Cordova, and representatives from Local 150 signed the Quarry Agreement. (Stmt. of Undisputed Facts, ¶ 8.)

The Quarry Agreement states:

This Agreement shall be in force and effect from the 3rd day of May, 2010 through 11:59 p.m. May 3, 2015, inclusive, and shall renew from year to year thereafter unless either party serves written notice upon the other of intent to modify or terminate the Agreement not less than sixty (60) days prior to any expiration date.

(Stmt. of Undisputed Facts, ¶ 9; R.1-1, Quarry Agreement, at Article 24, Duration and Termination.)

With respect to hospitalization and medical insurance for the Welfare Fund, the Quarry Agreement states:

---

[3] The parties' statements of facts refer to Cleveland Quarry in Cleveland, Illinois (Stmt. of Undisputed Facts, ¶ 7) and to "Cleveland Quarry that operates a quarry in Colona, Illinois" (Stmt. of Addt'l Undisputed Facts, ¶ 11). The parties do not dispute the different location and for the purposes of this motion, the fact is immaterial.

Section 1.  It is understood and agreed that there shall be continued an insurance plan known as the [Welfare Fund], and the Employer shall make the following contributions for each hour for which an employee receives wages under the terms of this Agreement payable to the [Welfare Fund]:

…

It is understood and agreed that the Employer shall be bound to the terms and provisions of the Agreement and Declaration of Trust of the Midwest Operating Engineers Welfare Fund, and all amendments heretofore or hereafter made thereto, as though the same were fully incorporated herein.

If payments for contributions as defined above [are] not received by the Fund Office by the twentieth (20th) day of the month, the Employer shall be deemed to be in violation of this Agreement and the aforementioned Trust Agreement.  The Employer shall be liable for any claim that may arise on account of such non-payment.

…

Section 3.  The Employer's responsibility to make contributions to the Welfare Plan shall terminate upon termination of this agreement.

(Stmt. of Undisputed Facts, ¶ 10; R.1-1, Quarry Agreement, Article 8, Hospital and Medical Insurance, Sections 1, 3.)

With respect to the pensions for the Pension Fund, the Quarry Agreement states:

Section 1.  It is understood and agreed that there shall be continued a Trusteed Pension Plan known as the [Pension Fund], and the Employer will contribute the sum of $4.40 per hour for each hour for which an employee receives wages under the terms of this Agreement to the [Pension Fund].

…

It is understood and agreed that the Employer shall be bound to the terms and provisions of the Agreement and Declaration of Trust of the [Pension Fund], and all amendments heretofore or hereafter made thereto, as though the same were fully incorporated herein.

If payments for contributions as defined above [are] not received by the Fund Office by the twentieth (20th) day of the month, the Employer shall be deemed to be in violation of this Agreement and the aforementioned Trust Agreement.  The Employer shall be liable for contributions due, liquidated damages, interest and any other cost of collection.

(Stmt. of Undisputed Facts, ¶ 11; R.1-1, Quarry Agreement, Article 21, Pensions, Section 1.)
The severability terms of the Quarry Agreement state: "[i]f any portion of this Agreement is
declared illegal, it shall not in any way affect the remaining portion of this Agreement."  (Stmt.
of Undisputed Facts, ¶ 12; R.1-1, Article 19, Separability and Savings.)  In addition to the
language binding Cordova to its Welfare Fund obligations in the Quarry Agreement, the
Declaration of Trust for the Welfare Fund states that employers are required to make
contributions in the amounts specified in the applicable collective bargaining agreement and that
this obligation is absolute.  (Stmt. of Undisputed Facts, ¶ 13; R.10-5, Decl. of Trust of Welfare
Fund, Article VI, Contributions to the Trust Fund.)[4]  Similarly, the Declaration of Trust for the
Pension Fund states that employers are bound to all terms and conditions set forth in the
collective bargaining agreement (Article III) and are required—by an absolute obligation—to
make contributions in the amounts specified in the applicable collective bargaining agreement
(Article VI).  (Stmt. of Undisputed Facts, ¶ 16; R.10-4, Agreement and Decl. of Trust of the
Pension Fund, Articles III, VI.)

---

[4] Cordova's responses to the Funds' statement of facts in Paragraphs 13 and 16 contend, without
explanation, that the evidence cited does not support the asserted facts.  The Court disagrees.  *See Smith v.
Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[A] mere disagreement with the movant's asserted facts is
inadequate if made without reference to specific supporting material.").  Regarding the Decl. of Trust of
the Welfare Fund, Article VI states in support of Plaintiffs' asserted facts: "Employers … by virtue of
their … [b]eing bound to a written Collective Bargaining Agreement entered into by them … and the
Union requiring Employer Contributions to the Trust Fund, on behalf of Employees within the bargaining
unit thereunder … shall make prompt payment of the required Employer Contributions in such amount
and upon the terms and conditions specified in the applicable Collective Bargaining Agreement …".  (*See*
R.10-5, Article VI.)  The declaration further states that "[t]he obligation of the Employers to make the
required Employer Contributions, as herein specified, shall be absolute …" (*Id.*)  Very similar language
is found in the Decl. of Trust of the Pension Fund in Articles III and VI.  (R.10-4, Articles III, VI.)

### C.    Decertification & the Cleveland Quarry Dispute

On July 10, 2013, the employees of Cleveland Quarry voted to decertify Local 150 as their bargaining agent in an election conducted by the NLRB.  (Stmt. of Undisputed Facts, ¶ 19.) The Employer ceased making contributions to the Funds shortly thereafter.  (Stmt. of Undisputed Facts, ¶ 19.)  On April 9, 2014, the Funds filed suit against Cleveland Quarry, a division of RiverStone Group, Inc., and filed a First Amended Complaint in that case on June 6, 2014. (Stmt. of Undisputed Facts, ¶ 20; *see also Welfare Fund and Pension Fund v. Cleveland Quarry,* Case No. 14-cv-2557, First Am. Complt., June 6, 2014, ECF No. 14.)  A representative of Cleveland Quarry, Marshall Guth, and representatives from Local 150 signed the CBA between Cleveland Quarry and Local 150.  (Stmt. of Undisputed Facts, ¶ 21.)  On May 22, 2014, Matthew B. Robinson from the law firm of Hesse Martone, P.C., filed an appearance on behalf of the defendant, Cleveland Quarry.  (Stmt. of Undisputed Facts, ¶ 22; *see also Cleveland Quarry*, Case No. 14-cv-2557, ECF No. 8.)[5]  On August 25, 2014, the *Cleveland Quarry* court found "as a matter of law … [that] the Funds are entitled to enforce Quarry's obligations to contribute to the Funds under the CBA."  (Stmt. of Undisputed Facts, ¶ 23; *see also Midwest Operating Engineers Welfare Fund v. Cleveland Quarry*, 40 F.Supp.3d 1033, 1034 (N.D. Ill. 2014) (Shadur, J.) ("*Cleveland Quarry*").)  On June 10, 2015, Mr. Guth submitted an affidavit on behalf of RiverStone Group, Inc.'s Cleveland Quarry division in support of Cleveland Quarry's motion for reconsideration and for summary judgment.  (Stmt. of Undisputed Facts, ¶ 24; *see also Cleveland Quarry*, Case No. 14-cv-2557, ECF No. 38, Ex. 10.)  The district court denied Cleveland Quarry's motion for reconsideration on June 12, 2015 and entered judgement in favor

---

[5] Mr. Robinson has also filed an appearance in the present action on behalf of Cordova.  (Stmt. of Undisputed Facts, ¶ 32.)

of the Funds and against Cleveland Quarry in the amount of $459,435.65" on July 22, 2015. (Stmt. of Undisputed Facts, ¶ 24; *Cleveland Quarry,* Case No. 14-cv-2557, ECF Nos. 47, 48.) Defendant Cleveland Quarry's appeal is currently pending in the Seventh Circuit. (*Cleveland Quarry*, Case No. 14-cv2557, ECF Nos. 49-74.)

### D.      Decertification & the Cordova Dredge Dispute

On October 14, 2014, a Cordova employee filed a petition to decertify Local 150 as the collective bargaining representative of the employees working at the Cordova Dredge facility. (Stmt. of Undisputed Facts, ¶ 29.) On October 27, 2014, SubRegion 33 of the NLRB conducted a hearing into that petition at which Mr. Guth testified as RiverStone's party representative. (Stmt. of Undisputed Facts, ¶ 29; R.10-3, Certification of Election Results stating "no labor organization is the exclusive representative of the employees in the bargaining unit …").) Steven Davidson represented Local 150 in the NLRB's decertification proceedings involving Cordova employees. (Stmt. of Addt'l Undisputed Facts, ¶ 9.) On December 15, 2014, Cordova's employees voted to decertify Local 150 as their bargaining agent in an election conducted by the NLRB. (Stmt. of Undisputed Facts, ¶ 30; R.10-3, at 2.) Cordova made health insurance contributions to the Welfare Fund and pension contributions to Pension Fund under Articles 8 and 21 of the collective bargaining agreement. (Stmt. of Undisputed Facts, ¶ 28.) The NLRB certified the results of that election on March 11, 2015 and Cordova ceased making contributions to The Funds shortly thereafter, on March 15, 2015. (Stmt. of Undisputed Facts, ¶¶ 30; 28.)

On March 24, 2015, Cordova sent a letter notifying the Funds of the Union's decertification, stating Cordova's position that it "no longer contributes to [the Funds] … due to the decertification of [Local 150]." (*See* Stmt. of Addt'l Undisputed Facts, ¶ 2; R.21-1, Guth Decl., ¶ 10; R.21-2, Ex. F, Letter from A.Eggers to T.Bernstein dated March 24, 2015.) The

letter further stated that "[i]f [the Funds] believe any further action is required by the employer to terminate its obligation to contribute to the Funds, please provide such information to the undersigned by certified mail return receipt requested and email." (*See* R.21-2, Ex. F.) Cordova submitted a contribution report to the Funds on March 30, 2015 and has not submitted a contribution report since that time. (Stmt. of Addt'l Undisputed Facts, ¶ 4; R.21-3, Ex. G, Report Confirmation dated March 30, 2015.) On May 20, 2015, the Funds filed this lawsuit to collect unpaid contributions. (Stmt. of Undisputed Facts, ¶ 31.)

Cordova claims that after it ceased making contributions to the Funds, it provided health insurance coverage to the impacted employees through the company health insurance plan and the employees did not suffer a lapse in coverage. (Stmt. of Addt'l Undisputed Facts, ¶ 5; R.21-1, Guth Decl., ¶¶ 13, 14.)[6] In addition, Cordova claims that after it ceased making contributions to the Funds, it provided retirement plan contributions to the impacted employees through the company retirement plan. (Stmt. of Addt'l Undisputed Facts, ¶ 6; R.21-1, Guth Decl., ¶ 15.) In addition to replacing the employees' health insurance and retirement benefits, Cordova increased the employees' wage rates. (Stmt. of Addt'l Undisputed Facts, ¶ 7; R.21-1, ¶ 16.) Cordova did not sign a Participation Agreement with Local 150, and such a document does not exist in

---

[6] The Funds' replied to a series of Cordova's additional statement of facts making unsupported denials and stating that "[b]ecause Cordova filed its Motion to Dismiss before the close of discovery, the Funds have not had the opportunity to depose Mr. Guth and are without sufficient information to admit or dispute this claim." (*See* R.24, ¶¶ 5-7.) This practice is problematic for at least two reasons. First, under Local Rule 56.1, these responses are inappropriate. If a party disputes a fact, it must point to record evidence in support of the denial. To the extent that a party denies a statement of fact because it lacks knowledge, these facts will be deemed admitted without specific comment by the Court. *See e.g., Bires v. WalTom, LLC*, 662 F.Supp.2d 1019, 1023 (N.D. Ill. 2009). Second, the Funds moved for summary judgment in reply to Cordova's motion to dismiss. To the extent they now recite an inability to have completed fact discovery prior to the filing of motions dealing with factual disputes, the Funds—not Cordova—are responsible for such a posture in the case.

Cordova's files and has never been presented to Cordova by the Funds. (Stmt. of Addt'l Undisputed Facts, ¶ 8.)

## ANALYSIS

The Court is faced with the parties' cross motions for summary judgment regarding Cordova's payment obligations to the Funds in light of the Union's decertification. Cordova argues that the Funds' claims fail because decertification of the Union voided the CBA and the Funds have not provided an alternative written agreement that would require Cordova to continue contributions following decertification. (*See* R.10, at 3-6.) Cordova further argues that the Seventh Circuit has never held that an employer is still required to contribute under a CBA after the Union is decertified, the plain language of the CBA does not require contributions to be made after decertification, and that to make such contributions would be illegal. (*See* R.10, at 7-13.)

In addition to responding to Cordova's arguments, the Funds argue that the district court's decision in the *Cleveland Quarry* case has preclusive effect here and that Cordova's arguments are precluded by principles of *res judicata* or, alternatively, Cordova is collaterally estopped by the *Cleveland Quarry* decision. (R.17, at 2-5.) The Funds further assert that even if the Court does not find the *Cleveland Quarry* decision preclusive, the Court should adopt its findings and reasoning and require Cordova to remit contributions to the Funds.

## I. Preclusive Effect of the *Cleveland Quarry* Decision

Federal common law determines the preclusive effect of a federal court judgment. *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008); *Ross ex rel Ross v. Bd. of Educ. of Tp. High School Dist. 211*, 486 F.3d 279, 283 (7th Cir. 2007). The Funds seek to preclude Cordova from raising the apparent defense that the collective bargaining agreement at issue is void as a matter of law

14

because another district court already resolved the issues surrounding the present case in favor of the Funds in the *Cleveland Quarry* litigation. The Funds also phrase the legal issue as "whether the Funds may collect contributions from Cordova under the remaining term of the collective bargaining agreement even though the Union has been decertified as the exclusive representative of the employees." (*See* R.23, at 2.)

### A.    Collateral Estoppel Does Not Apply

The Funds argue that collateral estoppel bars Cordova's arguments. Collateral estoppel, or issue preclusion, "applies to prevent relitigation of issues resolved in an earlier suit." *Adams v. City of Indianpolis*, 742 F.3d 720, 736 (7th Cir. 2014). "Issue preclusion has the following elements: (1) the issue sought to be precluded is the same issue as an issue in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; (3) the determination of the issue must have been essential to the final judgment; and (4) the party against whom estoppel is invoked must have been represented in the prior action." *Id.* With respect to issue preclusion, the Funds bear the burden of establishing that the doctrine applies and must demonstrate with clarity and certainty the district court's determination in the prior proceedings. *See Jones v. City of Alton, Ill.,* 757 F.2d 878, 885 (7th Cir.1985).

Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude re-litigation of the issue in a suit on a different cause of action involving a party to the first case. *Allen*, 449 U.S. at 94. The requirement of mutuality in applying collateral estoppel to bar litigation of issues decided in earlier federal court suits has been eliminated. *See Allen*, 499 U.S. at 94-95. Indeed, a litigant who was not a party to a federal case is allowed "to use collateral estoppel 'offensively' in a new federal suit against the party who lost on the decided issue in the first case. *Id.* The general limitation to application of

collateral estoppel is that "[t]he party against whom the issue had been resolved must have had, first, a 'full and fair opportunity' to litigate the issue in the previous suit ... and, second, a meaningful opportunity to appeal the resolution of the issue." *Carter v. C.I.R.*, 746 F.3d 318, 321 (7th Cir. 2014), *as amended on denial of reh'g* (Apr. 25, 2014) (*citing DeGuelle v. Camilli, 724 F.3d 933, 935 (7th Cir. 2013)* (citations omitted)).

As an initial note, Cordova argues that collateral estoppel does not apply here because the *Cleveland Quarry* decision is currently pending appeal in the Seventh Circuit. This procedural fact, however, does not disturb the potentially preclusive effect of the district court's decision. *See Prymer v. Ogden,* 29 F.3d 1208, 1215, n.2 (7th Cir. 1994) (summarizing cases) (explaining the approach of the Seventh Circuit has, "for many years", been to recognize a final judgment of a court in the first instance can be given collateral estoppel effect even while an appeal is pending); *see also Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 500 F. Supp. 2d 864, 868 (N.D. Ill. 2007) (citations omitted) ("[a] pending appeal does not prevent the application of collateral estoppel or res judicata"); *Stelmokas v. Madson*, No. 11 C 3649, 2011 WL 4738263, at *2 (N.D. Ill. Oct. 5, 2011) (*citing Prymer*, 29 F.3d at 1213, n.2) (finding a judgment "final for collateral estoppel purposes, even though an appeal of the judgment in that case is pending").

The extent of the Funds' arguments advocating for application of collateral estoppel are brief:

> Cordova Dredge and Cleveland Quarry are both divisions of the RiverStone Group. Both are managed by Marshall Guth, who signed the CBAs for both division. Both are represented by the same lawyers, who have offered the same legal arguments rejected in *Cleveland*. Cordova Dredge's interests were fully and fairly represented in the *Cleveland* case.

(*See* R.17, at 5.) Cordova mainly disputes that it offered the same legal arguments in the *Cleveland Quarry* case and argues that it was not provided a full and fair opportunity to litigate its case. The Funds' assertion that Cleveland Quarry and Cordova presented the same legal

arguments is cursory and the only facts cited in support reference: (1) that the same litigation counsel represented Cleveland Quarry and Defendant Cordova (R.21, ¶ 22), and (2) that the Funds filed the present lawsuit to collect unpaid contributions from Cordova (*see id*, ¶ 31). Plaintiffs have, therefore, not met their burden of establishing that the *Cleveland Quarry* case and the present action are legally similar and the Court is left without the clarity and certainty required to analyze collateral estoppel in this case. As such, the Plaintiff Funds failed to meet their burden to show application of collateral estoppel here.

In addition, Cordova argues it lacked a full and fair opportunity to litigate these issues below. In the *Cleveland Quarry* litigation, at the district court's direction, the parties limited their initial submissions to liability.[7] *See Cleveland Quarry*, 40 F.Supp.3d at 1034. When Cleveland Quarry filed a summary judgment motion with supporting affidavits and exhibits, the district court struck the submission other than the supporting legal memorandum. (*See* R.21-4; R.21-5; R.21-8; R.21-9; R.21-10.) After ruling on the *Cleveland Quarry* liability submissions, the district court denied Cleveland Quarry's motion for reconsideration and entered final judgment. In the present case, in response to Cordova's motion to dismiss, the Funds filed a summary judgment motion referencing documents outside of the Complaint. Cordova responds with statement of facts and arguments also relying on additional materials not attached to or referenced in the Complaint and not a part of the public record. Given that the facts and

---

[7] At the status hearing on May 28, 2014, the plaintiffs' counsel stated "we contemplate something like a judgment on the pleadings motion or summary judgment. I mean I think we are going to have to look at off-pleading material in order to resolve this. So --" (R.21-8, Ex. L. *Cleveland Quarry*, Case No. 14-cv-2557, Status Hrg. Tr., May 28, 2014, ECF No. 24.) After discussion of motions under Rule 16, the Court indicated that "you don't have to be governed by the tyranny of labels. Simply file cross-motions that deal with the liability issue." (*Id.*) The court ordered the parties "to file cross-motions as to the issue of liability … and to file cross-responses …". (R.21-9, Ex. M, *Cleveland Quarry*, Case No. 14-cv-2557, Minute Entry, ECF No. 11; *but see Cleveland Quarry*, 40 F.Supp.3d at 1034 (explaining that the district court ordered the parties to submit motions pursuant to Federal Rule of Civil Procedure 16 on the issue of liability).

evidence presented before the Court in the present case significantly differ from those presented before the *Cleveland Quarry* court, the Court cannot find that Cordova—by way of the defendant Cleveland Quarry—had a full and fair opportunity to litigate the legal issues as presented here. Accordingly, the Court denies the Funds' motion for summary judgment on the basis of collateral estoppel.

## B.  *Res Judicata* Does Not Apply

Alternatively, the Funds argue for preclusive effect under the more broad doctrine of *res judicata*.  The preclusive effect of a federal court judgment is determined by federal common law.  *Taylor*, 553 U.S. at 891.  In federal court, *res judicata* (claim preclusion) has three elements: "(1) an identity of the parties or their privies in the first and second lawsuits; (2) an identity of the cause of action; and (3) a final judgment on the merits of the first suit." *Adams*, 742 F.3d at 736.  Res judicata is an affirmative defense, thus the Funds have the burden of establishing that res judicata bars Cordova's defense to payment obligations.  *See Taylor,* 553 U.S. at 907; *ITOFCA, Inc. v. MegaTrans Logistics, Inc.*, 322 F.3d 928, 933 (7th Cir. 2003) (*citing Kulavic v. Chi. & Illinois Midland Ry. Co.,* 1 F.3d 507, 516 (7th Cir. 1993)) (explaining that the defendant has the burden of establishing that res judicata bars the plaintiff's action).

As stated by the Supreme Court, "under *res judicata*, a final judgment on the merits of an action precludes the parties or their privies from re-litigating issues that were or could have been raised in an action."  *Allen v. McCurry*, 449 U.S. 90, 94 (1980); *Czarnieki v. City of Chicago*, 633 F.3d 545, 548 (7th Cir. 2011) ("The doctrine of [*res judicata* or] claim preclusion is premised on the idea that, when a claim has been fully litigated and comes to judgment on the merits, finality trumps"); *Highway J Citizens Grp. v. United States Dept. of Transp.*, 456 F.3d 734, 741 (7th Cir. 2006) (*citing Nevada v. United States,* 463 U.S. 110, 129-30, 103 S.Ct. 2906,

77 L.Ed.2d 509 (1983) ("Simply put, the doctrine of *res judicata* provides that, when a final judgment has been entered on the merits of a case, it is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose")).

As an initial note, the parties do not dispute the finality of the judgment from *Cleveland Quarry*. The Funds assert that the element of finality is met here where the *Cleveland Quarry* district court found in favor of the Funds on the issue of liability, denied Cleveland Quarry's motion for reconsideration and summary judgment, and entered final judgment on behalf of the Funds. (Stmt. of Undisputed Facts, ¶¶ 23, 25; *see also Cleveland Quarry*, Case No. 14-cv-2557, Judgment Order, July 23, 2015, ECF No. 48). Indeed, Cleveland Quarry admitted the finality of the order in its Amended Notice of Appeal, stating that it "hereby appeals … from the final judgment of the [district court] entered by an Order [doc#47] and Judgment Order [doc#48] dated July 22, 2015 *nunc pro tunc* July 21, 2015". (*Cleveland Quarry*, Case No. 14-cv-2557, Judgment Order, July 23, 2015, ECF No. 67.) As such, the Court finds the third element met here.

The Funds, however, have not established the remaining two elements for res judicata and, therefore, have not satisfied their burden to show that res judicata bars Cordova's defenses in this case.

### 1. The Funds Have Not Established That Cordova and Cleveland Quarry Are In Privity

According to the Funds, because Cleveland Quarry and Cordova are divisions of the same corporation—RiverStone Group, Inc—they are in privity with one another for the purposes of res judicata. (*See* Stmt. of Undisputed Facts, ¶¶ 4, 8, 20, 21, 22, 24, 27; R.1, Compl, ¶ 3.) The

Funds rely on *Aetna Casualty and Surety Co. of Harford Conn. v. Kerr-McGee Chem. Corp.*, for the proposition that subsidiaries of the same corporate parent are in privity with one another under Illinois law. *See* R.17, at 4 (*citing Aetna Casualty & Surety Co. of Harford Conn. V. Kerr-McGee Chem. Corp.*, 875 F.2d 1252, 1257 (7th Cir. 1989). In *Aetna*, however, the Seventh Circuit did not look at the relationship between the subsidiaries. *Aetna Casualty*, 875 F.2d at 1256-57. Instead, the Seventh Circuit addressed the relationship between the subsidiary and its parent corporation and whether they meet the "same parties" requirement under the Illinois statute, which "is met only where the parties in the two actions have sufficiently similar interests so that res judicata would apply between them." *Id.*, at 1257. The Seventh Circuit noted the similarity of interests shared between the subsidiary and the parent corporation—suing "on behalf of" its subsidiaries—to obtain a remedy for injuries the subsidiaries suffered. *Id.*

The situation in *Aetna* differs from the one presented here, where the Funds are not arguing the "same parties" requirement under Illinois statutory law applies and the Funds have filed two separate suits against two different subsidiaries of the same parent corporation for a demand of payment obligations under collective bargaining agreements. Indeed, federal courts apply a "functional approach" to determine whether parties are in privity, "focusing on the general question of whether the earlier parties were in some sense proper agents for the later parties," to justify binding the result for the first party to the second party. *See Tice v. American Airlines,* 162 F.3d 966, 971-72 (7th Cir. 1998); *Studio Art Theatre v. City of Evansville*, 76 F.3d 128, 131 (7th Cir. 1996) (explaining that one factor courts consider when determining privity is whether the parties in the two suits could be exchanged for one another, with their interests remaining sufficiently represented). The Funds do not explain how the interests of the subsidiaries are similar enough to warrant imposition of privity. Indeed, taking the facts in the

light most favorable to Cordova, the individual interests of Cleveland Quarry and Cordova are sufficiently similar where, as here, the subsidiaries are different companies with different employees that operate separate businesses from different locations. Furthermore, the companies decertified Local 150 in separate proceedings that occurred at different times. These differences are not nominal in terms of their potential effect on each divisions' interests in the legal actions at issue and do not create a situation where Cordova and Cleveland Quarry are "readily interchangeable" with one another. *Cf. Serv. Employees Int'l Union Local 1 v. Digby's Detective & Sec. Agency, Inc.*, No. 08 C 5544, 2009 WL 721003, at *2-3 (N.D. Ill. Mar. 18, 2009) (*citing Studio Art Theatre*, 76 F.3d at 131 (7th Cir. 1996) (finding the parties in privity for purposes of res judicata because the legal issues showed "clear congruence" and the parties were "readily interchangeable"). As such, the facts, as presented here, do not warrant imposition of privity for the purposes of *res judicata*.

      **2.**     **The Cause of Actions Do Not Stem from the Same Core of Operative Facts**

In addition, the Funds have failed to establish that the cause of action here stems from the same core of operative facts. Whether there is an identity of the cause of action depends on "whether the claims comprise the same core of operative facts that give rise to a remedy." *Adams*, 742 F.3d at 736 (citation omitted). The determination of the existence of an identity between parties in later and prior suits involves a fact-specific inquiry into the particular circumstances of a case. *See id.* at 995 (internal citations and quotations omitted). To satisfy the identity of the cause of action element, the Funds must show that the claims are "based on the same, or nearly the same, factual allegations arising from the same transaction or occurrence." *Bernstein v. Bankert*, 733 F.3d 190, 226 (7th Cir. 2013). "In order to provide meaningful notice to litigants and 'to yield predictable results,' the transactional test must be applied to the facts of

a case 'at a sufficient level of specificity.'" *See United States ex rel. Lisitza v. Par Pharm. Co, Inc.*, 62 F.Supp.3d 743, 750 (N.D. Ill. 2014) (*citing Andersen v. Chrysler Corp.*, 99 F.3d 846, 852-53 (7th Cir. 1996)).

The Funds argue that Cordova and Cleveland Quarry are two divisions of the same company, are represented by the same lawyers, had a collective bargaining relationship with the same Union, negotiated essentially identical agreements, and participated in the same health and welfare and pension funds. In addition, in each case the employees voted to decertify the Unions as the exclusive bargaining representative of the employees and the Funds sued to collect contributions for the remainder of both collective bargaining agreements—both of which expired on the same day. The Funds contend that the only differences between the defendants are the location of their facilities and the specific employees involved—facts not relevant to the legal question presented. Cordova responds that the cases arise from completely different transactions with each defendant in different geographical locations (Cleveland Quarry in Colona, IL and Cordova Dredge in Cordova, IL), deal with separate collective bargaining agreements, involve separate votes for decertification conducted at different times and separate disputes filed in court at different times.

Taking the facts in the light most favorable to Cordova, the circumstances in this case do not stem from the same operative facts. Cordova and Cleveland Quarry are different companies with different employees who voted on separate occasions to decertify Local 150. The companies then ceased payment to the Funds at separate times and the circumstances surrounding the cessation of payment have not been alleged to be similar (e.g., sending notice letters, notification of decertification to the Funds, communication between Cordova and Cleveland Quarry post-decertification). Although the undisputed facts show that similarities

exist—namely, the jointly negotiated CBAs and the contributions to the Funds—they also show that there are differences in the relevant delinquent time periods and the individual decisions underlying cessation of payments for each defendant, including the time period of voting, refraining from payment, and the employer and employees making the decisions. *See United Food & Commercial Workers Local 100-A Health & Welfare Fund v. City Foods, Inc.*, 878 F.Supp.122, 123-24 (N.D. Ill. 1995) (finding res judicata did not apply because the claims did not arise from the same core of operative facts where the payment deficiencies occurred over different periods and the bases for the wrongs differed).

Accordingly, because the facts taken in the light most favorable to Cordova fail to establish privity between Cordova and Cleveland Quarry and fail to demonstrate that the actions arose from the same core of operative facts, the Court denies the Funds' motion for summary judgment regarding the application of collateral estoppel to bar Cordova's defenses.

## II.  No Genuine Issues of Material Fact Exist Precluding a Finding that Cordova is Liable for Contributions to the Funds, in Terms of Withdrawal Liability under 29 U.S.C. § 1145

The Multiemployer Pension Plan Amendments Act ("MPPAA"), Pub.L. 96-364, 94 Stat. 1208 (Sept. 26, 1980), imposes liability on employers who withdraw from multiemployer plans governed by ERISA.  Section 505 of ERISA provides that "every employer who is obligated to make contributions to a multiemployer plan … under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of … such agreement."  29 U.S.C. § 1145.  As explained by the Seventh Circuit:

> Multiemployer plans are defined-benefit plans, meaning that they must pay beneficiaries a set level of benefits 'even if the contributions they expected to receive do not materialize'. *Central States, S.E. & S.W. Areas Pension Fund v. Gerber Truck Serv., Inc.,* 870 F.2d 1148, 1151 (7th Cir. 1989) (en banc). Accordingly, when an employer withdraws from a multiemployer plan and stops

contributing, there is a risk that the burden of funding its employees' benefits will be shifted to the other employers in the plan or to the Pension Benefit Guaranty Corporation, which ensure these benefits. *Central States, S.E. & S.W. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1371 (7th Cir. 1992). The MPPAA guards against this risk by imposing withdrawal liability on employers who pull out of multiemployer plans. 29 U.S.C. § 1381(a). The statute sets this liability at an amount equal to a proportionate share of the withdrawing employer's unfunded vested benefits. *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 217, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986).

*Central States, Southeast & Southwest Areas Pension Fund v. Schilli Corp.* 420 F.3d 663, 667 (7th Cir. 2005) ("*Schilli*"). "The MPPAA requires that, upon an employer's withdrawal from a multiemployer plan, the plan determine the amount of withdrawal liability due under a statutory formula, notify the employer of the amount of liability, and collect that amount from the employer." *Id.* at 666 (*citing* 29 U.S.C. § 1382). "The pension fund or welfare fund is like a holder in due course in commercial law;" that is, funds "are entitled to enforce the [CBA] without regard to the understandings or defenses applicable to the original parties." *Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Servs., Inc.*, 870 F.2d 1148, 1151 (7th Cir. 1989) ("*Gerber Truck*"). In other words, a fund's "reliance upon the terms of a CBA may not be thwarted … by defenses that may defeat enforcement of the CBA between the employer and the union." *Central States, Southeast & Southwest Areas Pension Fund v. Kroger*, 73 F.3d 727, 731 (7th Cir. 1996). Indeed, "[i]f the employer simply points to a defect in the contract's formation—such as fraud in the inducement, oral promises to disregard test, or the lack of majority support for the union and consequent ineffectiveness of the pact under labor law—it must still keep its promise to the pension fund." *Gerber Truck*, 870 F.2d at 1153. "Anything less may well saddle the plans with unfunded obligations." *Id.* Put differently, "sound pension policy demands that employers who enter into agreements providing for pension contributions not be permitted to repudiate their pension promises." *Gerber Truck*, 870 F.2d at 1153.

The Seventh Circuit's decision in *Schilli* is instructive here.  In *Schilli*, the Seventh Circuit affirmed the district court's determination that an employer remained obligated to contribute to the plaintiff's fund until the defendant complied with a notice provision contained in a separate participation agreement entered into by the employer and the plan.  420 F.3d at 673; *see also Central States, Southeast & Southwest Area Pension Fund v. Schilli Corp.*, No. 03 C 8880, 2004 WL 2608281, at *4-5 (N.D. Ill. Nov. 16, 2004).  The defendant in *Schilli* was the parent corporation for a subsidiary employer that contributed to a multiemployer plan governed by ERISA.  *Schilli*, 420 F.3d at 665.  The employee's representative union negotiated a series of consecutive CBAs with the employer which obligated the employer to contribute specified amounts to the pension fund.  *Id.*  In addition to the CBAs, the employer and union signed a separate agreement—a Participation Agreement—that obligated the employer to contribute to the multiemployer plan "pursuant to the terms of the [CBA]" and remained in "full force and effect until such time as the Employer notifies the Fund(s) by certified mail."  *Id.*, at 665-66.  After years of contributing to the fund, the employees filed a petition with the NLRB and upon an election, a majority of the employees voted to decertify the union as their representative.  *Id.*, at 666.

The defendant in *Schilli* argued that the decertification of the union terminated the employer's obligation to contribute to the fund under both the CBA and Participation Agreement by operation of law.  *See id.*, at 668.  In analyzing the employer's obligations under the two agreements, the Seventh Circuit found that "[d]ecertification terminates a union's rights by operation of law without regard to the language of the contract.  Just as decertification nullified the [CBA] before it would have expired by its terms, the Participation Agreement dissolved despite language purporting to continue it 'in full force and effect' until the described notice was

given" *Id.*, at 669.  Although the employer's obligations to contribute under the agreements terminated, the Seventh Circuit turned to the employer's liability for withdrawal from the fund under 29 U.S.C. § 1145.  *Id.* (explaining that the MPPAA authorizes multiemployer plans to sue for delinquent contributions owed "under the terms of the plan or under the terms of a collectively bargained agreement").  The Seventh Circuit noted that the MPPAA not only authorizes multiemployer plans to sue for delinquent contributions owed under Section 1145, but provides them with "greater rights under these documents than the union itself." *Id.*, at 670. These increased rights entitle a plan "to enforce the writing without regard to understandings or defenses applicable to the original parties." *Id.*  The Seventh Circuit concluded that decertification does not serve as a defense in a Section 1145 action.  *Id.*, at 671.  Specifically, "a union's lack of majority support or authority to collectively bargain, standing alone, will not preclude liability under § 1145." *Id.*  "[A] union loses its rights upon decertification because it no longer enjoys majority support or the authority to represent the bargaining unit.  Because the decertification defense rests on these rationales, we hold that it does not serve as a categorical bar to § 1145 liability." *Id.*

In the present case, it is undisputed that the Cordova employees voted to decertify the union—Local 150—and that Cordova ceased contributing to the Funds based on this decertification.  It is also undisputed that there is no additional agreement, e.g., a participation agreement, beyond the CBA and Declarations of Trust.  While the union's decertification nullified the CBA before it expired by its terms, it did not absolve Cordova from further contributions because the decertification did not preclude liability for contributions to the Funds under Section 1145.  *See Schilli,* 420 F.3d at 671.  This differential treatment of enforcement versus liability echoes that recognized by the *Cleveland Quarry* district court, holding that "the

Funds are entitled to enforce Quarry's obligation to contribute to the Funds in an action under Section 1145, notwithstanding the Union's decertification." *Cleveland Quarry*, 40 F.Supp.3d at 1038. The absence of an additional agreement does not dictate a result different from *Schilli* and *Gerber Truck* here because the Funds "are entitled to enforce the [CBA] without regard to the understandings or defenses applicable to the original parties" and "nothing in ERISA makes the obligation to contribute depend on the existence of a valid collective bargaining agreement." *See Gerber Truck*, 870 F.2d at 1151; *Schilli*, 420 F.3d at 670 (*citing Moriarty v. Svec*, 164 F.3d 323, 335 (7th Cir. 1998)). Accordingly, no genuine issues of material fact exist precluding a finding that Cordova is liable for contributions to the Funds as governed by 29 U.S.C. § 1145.

## A. Contributions to the Funds under 29 U.S.C. § 1145 Are Not Illegal

Cordova argues that under 29 U.S.C. § 1145, the Funds must establish Cordova's obligation to make contributions to them under the plan or pursuant to the CBA and that absent an agreement, it is unlawful for an employer to contribute to the Funds. (*See* R.10, at 4-6.) Cordova contends the decertification rendered the CBA void and "while an ERISA fund can enforce an agreement that is voidable, it cannot enforce a collective bargaining agreement that is void." (R.10, at 4 (*citing Laborer's Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768, 779 (7th Cir. 2002)). In *A & C Envtl.*, however, the Seventh Circuit addressed a CBA rendered void by fraud in its execution—in other words, a situation where a valid agreement never existed to begin with. (*See id.*, at 779 (as explained by the Seventh Circuit, "fraud in the execution … entails deceiving a party to an agreement as to the very nature of the instrument it signs so that the party actually does not know what he is signing or does not intend to enter into a contract at all")). This scenario differs from the present situation where Cordova has not raised a 'fraud in the execution' defense and the parties do not argue the invalidity of the CBA prior to decertification. Indeed, Cordova made contributions to the Funds for many years pursuant to the terms of the

CBA and never asserts those payments were improper. Although there is a "distinction between void and voidable contracts and a fund's ability to enforce a contract makes sense, because when a contract is void, it is as if it never existed" *Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768, 779 (7th Cir. 2002) (citation omitted)), it is also true that Cordova's reliance on the case law's references to "void" requires an improperly strict reading of the term that the cases do not support. The phrase from the Ninth Circuit case upon which Cordova relies, for example, states that a collective bargaining agreement becomes "void after decertification of the union". This language does not mean that a void agreement existed prior to decertification, *i.e.*, that the agreement should have never been entered into in the first place when found to constitute fraud in the execution. (*See* R.10, at 5 (*citing Sheet Metal Workers Int'l Assoc., Local No. 162 v. Jason Mfg., Inc.*, 900 F.2d 1392, 1400 (9th Cir. 1990).)[8] Accordingly, the CBA, albeit unenforceable by the Union after decertification, is not "void" in the sense that it suffices as a defense to liability to the Funds under Section 1145. *See Schilli*, 420 F.3d at 670.

## B. The Plain Language of the CBA Does Not Absolve Cordova of Withdrawal Liability Under Section 1145

Cordova argues that the plain language of the CBA demonstrates that a condition of its contributions to the Funds included Cordova's employees receiving wages "under the terms of the Agreement [CBA]" and that because the decertification voided the CBA, employees are no longer receiving wages as required, i.e., under the terms of the CBA. Cordova relies on two sections of the CBA—Article 8 [for the Welfare Fund] and Article 21 [for the Pension Fund]— which provide that Cordova "shall make the following contributions for each hour for which an

---

[8] Cordova's reliance on the 1986 opinion letter issued by the Pension Benefit Guaranty Corporation is equally unpersuasive as the opinion letter does not override the more recent *en banc* Seventh Circuit teachings of the legal effect of decertification on CBAs. *See e.g.*, *Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1151 (7th Cir. 1989) (en banc).

employee receives wages under the terms of this Agreement …".  (R.1-1, Articles 8 & 21.)

Cordova claims this language absolves it of any liability for contributions simply because of

decertification of the union.  Such a reading, however, would fly in the face of the Seventh

Circuit's teaching that "a union's lack of majority support or authority to collectively bargain,

standing alone, will not preclude liability under § 1145."  *See Schilli*, 420 F.3d at 671.

Accordingly, the plain language of the CBA does not support Cordova's position that Section

1145 precludes it from liability.[9]

## C.     Cordova's Withdrawal Liability Contributions Are Not "Inconsistent with Law" Under Section 1145

Cordova further argues that any contributions it makes post-decertification of Local 150

would now be unlawful because they would no longer fall within the statutory exception that

previously protected them as payments to a "representative."  Specifically, Cordova contends

that following decertification, a union is no longer the "representative" of the employer's

employees as required by 29 U.S.C. § 186(c)(5).   The Funds respond that a representative of

Cordova's employees established the Funds as required by the statutory exception and that

subsequent decertification did not change this fact.

Congress added 29 U.S.C. § 1145 (Section 515 of ERISA) entitled "Delinquent

contributions" to address collection problems.  *See Gerber Truck*, 870 F.2d at 1152.  "The text of

[Section 1145] is adapted to its purpose, making promises enforceable "to the extent not

inconsistent with law."  *Gerber Truck*, 870 F.2d at 1153.  "If the contract provides for the

---

[9] Cordova's reliance on a Fifth Circuit case from 2003 which finds decertification automatically terminates a CBA by operation of law is misplaced since the Seventh Circuit in the later 2005 case of *Schilli* explicitly "decline[d] to adopt the position of our sister circuits" after recognizing "that several of our sister circuits have suggested or held that decertification is a defense in § 1145 actions" *Schilli*, 420 F.3d at 671 (citing, *inter alia*, a Fifth Circuit case, *La. Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alred Miller Gen. Masonry Contracting Co.*, 157 F.3d 404, 408 (5th Cir. 1998)).

commission of unlawful acts, it will not be enforced." *Id.* (*citing Kasier Steel Corp. v. Mullins*, 455 U.S. 72, 77-78, 102 S.Ct. 851, 861-62, 70 L.Ed.2d 833 (1982))).[10]  The Labor Management Relations Act ("LMRA")—also known as the Taft-Hartley Act—prohibits the power of labor unions and specifically prohibits an employer from paying any money to: (1) any *representative* of his employees; or (2) to any labor organization which would admit to membership any of the employer's employees.  *See* 29 U.S.C. § 186(a)(1)-(2) (emphasis added).  An exception exists, however, for payments to a representative where "a trust fund [is] established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents" for pensions or for medical or hospital care.  *See* 29 U.S.C. § 186(c)(5); *Mazzei v. Rock N Around Trucking, Inc.,* 246 F.3d 956, 962 (7th Cir. 2001) (explaining the exception to the prohibition of payment to a representative found in 29 U.S.C. § 186(c)(5)).

Cordova's argument fails because it relies on a strained reading of the statutory language that decertification stripped the union of its "representative" status and that any payments Cordova makes to the Funds post-decertification no longer fall within the LMRA exception— rendering them unlawful.  Section 186(c)(5) speaks against this interpretation with its explicit reference to the representative status as important for the establishment of the trust fund, not as important for the continued payments into the trust fund.  Indeed, the understanding that the representative status is important when establishing the fund also aligns with the Seventh

---

[10] Although the *Schilli* plaintiff did not develop an argument on the point, the Seventh Circuit left the door open to the possibility of a continuing contribution—even assessed by withdrawal liability— being unlawful, stating "[i]f it would have been unlawful for [the employer] to continue to make contributions under the Participation Agreement following the union's decertification, it would have a valid defense.  [The plaintiff] does not develop an argument on this point, however."  *Schilli*, 420 F.3d at 671-72.

Circuit's concerns directed to ensuring that the trust fund is established "for the sole and exclusive benefit" of the employer's "employees … and their families and dependents". *See e.g., Stinson v. Ironworkers Dist. Council of S. Ohio & Vicinity Ben. Trust*, 869 F.2d 1014, 1018 (7th Cir. 1989) (*citing United Mine Workers of America Health & Retirement Funds v. Robinson,* 455 U.S. 562, 570, 102 S.Ct. 1226, 1231, 71 L.Ed.2d 419 (1982)) ("The 'sole purpose' of § 302(c)(5) [29 U.S.C. § 186(c)(5)] is to ensure that employee benefit trust funds are legitimate trust funds, used actually for the specified benefits to the employees of the employers who contribute to them"); *Hoffman v. Cent. States Se. & Sw. Areas Pension Fund*, No. 90 C 4132, 1992 WL 336376, at *11 (N.D. Ill. May 8, 1992) (*citing* 29 U.S.C. § 186(c)(5)) ("The LMRA prohibits employers and their representatives from paying, lending, or delivering money to unions, except where such payments are made "to a trust fund established for the sole and exclusive benefit of the employees of such employer, and their families and dependents"). Indeed, Cordova's reliance on *Culinary Workers and Bartenders Union No. 596 Health and Welfare Trust v. Gateway Café, Inc.,* further supports this interpretation as the Washington Supreme Court found it unlawful that an employer contribute to a fund established by a non-representative union. *See* 95 Wash 2d. 791, 796 (Wash. 1981).[11]

The undisputed facts demonstrate that the representative for Cordova's employees—Local 150—established the Welfare Fund and Pension Fund. As such, the language of Section

---

[11] Cordova's additional reliance on *Cofire Paving Corp.*, 359 NLRB No. 10 (2012) is unpersuasive as the NLRB's review of the administrative law judge's findings did not address the section 186(c)(5) issues. *See* 359 NLRB No. 10, *5, n. 13. Furthermore, after the *Cofire Paving* case was closed, the Supreme Court found that the President invalidly appointed three individuals named as recess appointments to the NLRB. *See NLRB v. Noel Canning*, ___ U.S. ___, ___, 134 S.Ct. 2550, 189 L.Ed.2d 538 (2014). One or more the invalidly appointed individuals participated in the issuance of the *Cofire Paving* decision and calls into question the status of the *Cofire Paving* case as a reliable decision. *See* https://www.nlrb.gov/cases-decisions/information-decisions-issued-january-4-2012-board-member-appointees?name=cofire.

186(c)(5) does not support Cordova's argument that contributions to the trust fund, post-decertification, are unlawful for this reason.

## CONCLUSION

For the reasons stated above, the Court denies the Funds' motion for summary judgment as it applies to the preclusive effects of collateral estoppel and *res judicata* and grants their motion for summary judgment as it relates to Cordova's liability for contributions to the Funds under 29 U.S.C. § 1145.  The Court denies Cordova's motion for summary judgment.


**DATED:  December 1, 2015**                           ENTERED

_____
AMY J. ST. EVE
United States District Court Judge